UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ILLUSIONS-DALLAS PRIVATE CLUB,　§
INC., ET AL.,　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　§
　　　　Plaintiffs,　　　　　　　　§
　　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　　§　CIVIL ACTION NO. 3: 04-CV-0201-B
　　　　　　　　　　　　　　　　　§　(consolidated with Civil Action No. 3:04-
JOHN T. STEEN, JR., ET AL.,　　　§　CV-0609-B)
　　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　§
　　　　Defendants.　　　　　　　　§

## MEMORANDUM OPINION AND ORDER

Plaintiffs operate private membership clubs within "dry" areas of the City and County of Dallas, Texas, at which food and alcoholic beverages are served and erotic dance performances are presented as entertainment. Plaintiffs challenge the constitutionality of a recently-enacted provision of the Texas Alcoholic Beverage Code which denies private club registration permits from being issued to clubs, like Plaintiffs, that operate as "sexually oriented businesses" ("SOBs"). Denial of these permits prevents these clubs from serving alcoholic beverages. The parties have filed cross motions for summary judgment. For the reasons that follow, the Court DENIES Plaintiffs' motion in its entirety and GRANTS Defendants' motion.

### I.  Factual Background

Plaintiffs Illusions-Dallas Private Club, Inc. ("Illusions") and Silver City function as private membership clubs organized under the laws of Texas. (App. in Supp. Pls.' Mot. Summ. J. ["Pls.' App."] at 7,9). They both operate facilities at which sexually-oriented dance performances are presented to the Clubs' members and guests. (*Id*.). The clubs derive their principal revenue from

1

food and alcohol service.  (*Id.* at 8, 10); Pls.' Brief in Supp. Pls.' Mot. Partial Summ. J. ["Pls.' MSJ Brief"] at 3).  Plaintiffs Hotel Development Texas, Ltd. and Green Star, Inc. are management companies that provide food and alcoholic beverage service to Illusions and Silver City, respectively. (Pls.' App. at 7, 9).

Both Illusions and Silver City are located in "dry" areas of Dallas County – the sale and public service of alcohol is prohibited there. (*Id.*)  Nevertheless, Chapter 32 of the Texas Alcoholic Beverage Code authorizes a private club, even in dry districts, to serve alcohol to its members and guests for on-premises consumption provided that the club holds a private club registration permit. Tex. Alco. Bev. Code § 32.01.  To obtain a permit, a club must satisfy a number of membership, operational, governance, and management requirements. *Id.* at § 32.03.  For example, the club must be an association of persons "for the promotion of some common object" and it also must "provide regular food service adequate for its members and their guests." *Id.* at § 32.03(b)(g).  Even after a permit is obtained, a private club may not sell alcohol, but rather may charge only for its service, not for the drink itself.  (Pls.' App. at 26, 36-37).  Casual members must apply for permanent or temporary membership in the club before being served alcohol.  (Pls.' App. at 35, 36-37).

Applicants for private club registration permits are asked to identify their type of business among a list of 10 categories, one of which is a "sexually oriented business".  (*Id.* at 40).  According to the Assistant Administrator for the Texas Alcoholic Beverage Commission (the "Commission"), until recently, applicants were not required to fill out that portion of the application, rather it was "self-declaring."  (*Id.* at 40, 42).  However, in October 2003 the 78th Texas Legislature passed, and

Governor Rick Perry signed, House Bill 7, which added subsection (k) to § 32.03[1] of the Code, which reads:

> A private club registration permit may not be issued to or maintained by a club for a premises located in a dry area if the club operates a sexually oriented business as defined by Section 243.002[2], Local Government Code, on the premises.

TEX. ALCO. BEV. CODE § 32.03(k).  Section 32.03(k) applies to permits issued on or after the effective date of the section.  Permits issued or renewed prior to the effective date are governed by the law in effect at the time such permits were issued or renewed, but § 32.03(k) governs subsequent renewals.  TEX. H.B. 7, 78th Leg., 3rd C.S. (2003).

Plaintiffs complain that the operation of § 32.03(k) will prevent their private club registration permits from being renewed.[3]  On February 2, 2004, Plaintiffs filed a Complaint for Declaratory and Preliminary and Permanent Injunctive Relief against various members of the Commission in their official capacities[4], seeking a judicial declaration that § 32.03(k) is unconstitutional on its face and as applied under the First, Fifth, and Fourteenth Amendments to the United States Constitution.[5]

---

[1]  Throughout this order this subsection will be referred to as § 32.03(k) or simply "the Statute."

[2]  Section 243.002 of the Local Government Code defines a "sexually oriented business" as "a sex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, or other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer." TEX. LOC. GOV'T CODE § 243.002.

[3]  At the time this lawsuit was filed on February 4, 2004, Illusions and Silver City held valid private club registration permits.  The State agreed not to enforce § 32.03(k) against Plaintiffs for at least six months of this litigation.  (Pls.' App. at 69-70).

[4]  For the sake of simplicity, throughout this order the Court will refer to Defendants as "the State" or "Defendants".

[5]  On November 3, 2004, the Court consolidated this case with *Plano Miller Club, Inc. et al. v. John T. Steen, Jr. et al.*, No. 3:04-cv-00609-B, which involves similar challenges to the constitutionality of § 32.03(k).

Plaintiffs also seek to enjoin Defendants from enforcing § 32.03(k) as to them.  Plaintiffs moved for partial summary judgment on July 22, 2004 seeking a declaration that § 32.03(k) is unconstitutional under the First and Fourteenth Amendments.  Defendants filed their Motion for Summary Judgment on September 20, 2004, seeking summary judgment as to all counts of Plaintiffs' complaint.

## II. Analysis

### A.    Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Only disputes about material facts will preclude the granting of summary judgment.  *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material fact exists.  *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990).  If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case.  Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case.  *Id.*; *Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgement is not appropriate.  *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence."  *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The non-moving party

4

must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475

U.S. at 587 (emphasis in original) (quoting FED. R. CIV. P. 56(e)).   To determine whether a genuine

issue exists for trial, the court must view all of the evidence in the light most favorable to the non-

movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for

the non-movant.  *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248.

## B.   Whether § 32.03(k) Is Unconstitutional Under the First Amendment

The Supreme Court of the United States has unequivocally held that erotic dancing, of the

type performed at the clubs at issue in this lawsuit, involves expressive conduct that orbits the outer

rim of First Amendment protection.  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000); *Barnes v.*

*Glen Theatre, Inc.*, 501 U.S. 560, 565-66 (1991); *J&B Entm't, Inc. v. City of Jackson, Mississippi*, 152

F.3d 362, 369 (5th Cir. 1998).   Nevertheless, the government may still regulate such activity, as

society's interest in protecting erotic expression is of a lesser magnitude than it is in, say, protecting

"untrammeled political debate."  *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 70 (1976).   The

central issue in this case is whether the First Amendment forbids the State from denying private club

registration permits – here, the functional equivalent of liquor licenses – to clubs operating as SOBs

in dry districts.

The Supreme Court has utilized two different, yet substantially similar, tests for reviewing

regulations of erotic expression.  Under the first, referred to as the *O'Brien* test:

> [A] government regulation [of expressive conduct] is sufficiently justified [1] if it is within
> the constitutional power of the Government; [2] if it furthers an important or substantial
> governmental interest; [3] if the governmental interest is unrelated to the suppression of free
> expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no
> greater than is essential to the furtherance of that interest.

*United States v. O'Brien*, 391 U.S. 367, 376-77 (1968).   The *O'Brien* test has typically been deployed

5

by courts when analyzing public indecency statutes and statutes imposing incidental limitations on First Amendment freedoms. *See City of Erie*, 529 U.S. at 289; *Barnes*, 501 U.S. at 566; *LLEH, Inc. v. Wichita County, Texas*, 289 F.3d 358, 365 (5th Cir. 2002); *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 713 (7th Cir. 2003).

The second analytical framework is the *Renton* test, "which considers: (a) whether a sexually oriented business zoning ordinance is a time, place and manner regulation; (b) whether the ordinance is aimed at the content of sexually-oriented speech (content-based) or the 'speech's' secondary effects on the community (content-neutral); and after passing those tests, (c) whether the ordinance is designed to serve a substantial governmental interest and leaves open reasonable alternative avenues of communication." *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 173 (5th Cir. 2003) (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986)). The *Renton* test typically applies to adult entertainment zoning ordinances, which are reviewed under the standards that apply to time, place, and manner regulations. *LLEH, Inc.*, 289 F.3d at 365; *Ben's Bar*, 316 F.3d at 713.

In *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003), the Seventh Circuit dealt with the question, similar to the one before this Court, of whether the government can constitutionally prohibit SOBs from selling alcoholic beverages. The Seventh Circuit recognized that adult entertainment liquor regulations do not fit neatly into either the *O'Brien* or *Renton* categorical boxes. *Id.* at 714 ("[I]t is not entirely clear whether [the regulation] should be analyzed as a time, place, or manner restriction or as a regulation of expressive conduct under *O'Brien*'s four-part test[.]"). The Court questioned whether any such misalignment is even relevant, given the Supreme Court's statement "that the time, place, and manner test embodies much of the same standards as

6

those set forth in *United States v. O'Brien*." *Id.* (citing *Barnes*, 501 U.S. at 566); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984) ("[I]n the last analysis [the *O'Brien* test] is little, if any, different from the standard applied to time, place, or manner restrictions."). And while the Fifth Circuit has declined to definitively decide whether the *O'Brien* and *Renton* tests are interchangeable, *see BGHA, LLC v. City of Universal City, Texas*, 340 F.3d 295, 298 (5th Cir. 2003), it suggested as much in *LLEH, Inc.*, 289 F.3d at 365-66.

Given the virtual interchangeability between the two tests, the Court finds it useful to employ the framework fashioned in *Ben's Bar*, which represents a hybrid of sorts between the *O'Brien* and *Renton* formulations. Under this framework "a liquor regulation prohibiting the sale or consumption of alcohol on the premises of adult entertainment establishments is constitutional if: (1) the State is regulating pursuant to a legitimate governmental power, (2) the regulation does not completely prohibit adult entertainment, (3) the regulation is aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments, and (4) the regulation is designed to serve a substantial government interest, narrowly tailored, and reasonable alternative avenues of communication remain available, or, alternatively, the regulation furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest." *Ben's Bar*, 316 F.3d at 722.

*(1)    Whether the State had the Constitutional Power to Enact § 32.03(k)*

The Court need spend little time with the first factor, as the State has the clear power to regulate the sale and consumption of alcohol in the exercise of its police powers. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 515 (1996) ("Entirely apart from the Twenty-first Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations.");

*Davidson v. City of Clinton, Mississippi*, 826 F.2d 1430, 1433 (5th Cir. 1987) ("Pursuant to the police power, the discretionary right of the states to regulate liquor sales, a dimension of the police power, is extensive."); TEX. ALCO. BEV. CODE § 1.03 ("This code is an exercise of the police power of the state for the protection of the welfare, health, temperance, and safety of the people of the state."). The State thus acted within its constitutional power when it enacted § 32.03(k). *J&B Entm't, Inc.*, 152 F.3d at 371.

*(2)     Whether the Regulation Completely Prohibits Adult Entertainment*

It is equally clear that § 32.03(k) does not absolutely prohibit sexually-oriented expression. Indeed, by its terms the Statute leaves erotic dancing untouched: § 32.03(k) merely prevents SOBs located in dry districts from obtaining private club registration permits.  Deprived of their permits, Plaintiffs can no longer provide alcoholic beverage service under Texas law; however, they remain entirely free to purvey sexually explicit forms of entertainment.  *See Ben's Bar*, 316 F.3d at 723 (finding that challenged ordinance did not completely prohibit dancers from conveying an erotic message; "it merely prohibits alcohol from being sold or consumed on the  premises of adult entertainment establishments."); *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 998 (11th Cir. 2000) ("In prohibiting nude dancing where liquor is sold, the ordinance restricts only the place or manner of nude dancing without regulating any particular message it might convey.").

*(3)     Whether § 32.03(k) is Aimed at Combating Secondary Effects or the Suppression of Expression*

The Court next looks to whether the Statute is directed toward curbing unwanted secondary effects – *e.g.* increased crime, depressed economic activity, and lowered property values, *see Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 291 (5th Cir. 2003) – or whether it is aimed instead at burdening protected speech.  The resolution of this issue is important because it determines the

level of constitutional scrutiny to be applied. If the regulation was designed to restrict a form of expressive activity then it is presumed invalid and is subject to a strict scrutiny analysis. *Texas v. Johnson*, 491 U.S. 397, 403 , 411-12(1989); *Ben's Bar, Inc*., 316 F.3d at 723. If the government was instead predominantly concerned with striking at the secondary effects caused by or associated with SOBs, then the regulation is subjected to intermediate scrutiny. *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 448 (2002); *Encore Videos, Inc.*, 330 F.3d at 291.

The legislative record here is bereft of any hint explaining why the Texas legislature enacted § 32.03(k).[6] The question is whether this legislative silence matters. Plaintiffs say that it does, arguing that "Defendants must establish that the predominant legislative purpose behind the statute was not content-based, using only evidence of what the legislature actually intended at the time the law was passed." (Pls.' Reply to Defs.' Mot. Summ. J. ["Pls.' Reply Brief"] at 4).[7] On the contrary,

---

[6] Texas State Senator John Carona sponsored the Floor Amendment that ultimately became § 32.03(k). His remarks on the floor when offering the amendment fail to illuminate its purpose, and the State has come forward with no evidence bearing on legislative intent. (Pls.' App. at 109).

[7] Plaintiffs also contend that record evidence demonstrates that an improper animus toward protected sexual expression motivated the passage of § 32.03(k). First they cite to a February 11, 2004 e-mail message sent from David Alexander, the Commission's enforcement captain, to Jeanenne Fox, the Commission's Assistant Administrator, and others, which reads in pertinent part as follows:

> Just a heads up. A few months back we had lots of protests concerning two applications for Private clubs in Dry areas that would be Sexually oriented businesses (P.T.'s and Naxos) It started out with the protests, city meetings, etc. and ended up with Keffer and Corona getting a bill passed in the 3rd session to prohibit the issuance of the private club permit.

(Pls.' App. at 67). This e-mail is not necessarily probative of any mal-intent toward protected expression on the part of the State. Rather, it simply indicates that the Commission received various protests concerning the operation of SOBs in dry areas. The complaints could have been directed to any number of undesirable aspects of SOBs, including adverse secondary effects.

Plaintiffs also cite to a letter sent to the Commission by Senator Carona, the legislative sponsor of § 32.03(k). Recommending denial of a private club registration permit for a particular property located in Dallas, Senator Carona wrote:

the State argues that the actual intent of the enacting legislature is irrelevant; the State contends that all it must do to defend the Statute is present some evidence showing that the government has a current interest unrelated to the suppression of expression that the Statute is designed to address. (Defs.' Brief in Supp. Mot. Summ. J. ["Defs.' MSJ Brief"] at 9).

The Court finds that the State need not present evidence of actual legislative intent to uphold the Statute. In *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), two Indiana establishments desiring to present totally nude dancing, and two individual dancers employed thereby, sued on First Amendment grounds to enjoin the enforcement of an Indiana public indecency statute that required dancers to wear pasties and G-strings. *Id.* at 563-64. The plurality opinion noted that it was impossible to ascertain, other than from the statutory text, "exactly what governmental interest the Indiana legislators had in mind when they enacted this statute, for Indiana does not record legislative history, and the State's highest court has not shed additional light on the statute's purpose." *Id.* at 568. Significantly, Indiana's failure to articulate its motivations did not doom the statute, or even compel the application of strict scrutiny. Rather, Justice Souter explained in his concurrence[8] that

Although the applicant may have lawfully obtained a sexually oriented business license from the City of Dallas for this location, the operation of a private club serving alcoholic beverages in conjunction with a sexually oriented business offends the public sense of decency and threatens the general welfare, health, peace and morals of the community in which it is located.

(Pls.' App. at 68). Plaintiffs contend that Senator Carona's reference to "decency" and "morals" evinces his animus toward sexually candid expression. They ignore, however, that Senator Carona also appeared concerned that SOBs, together with alcohol, can threaten the "general welfare", "health", and "peace" of communities in which they are located, all concerns generally associated with secondary effects. And in any event, the Supreme Court has stated on multiple occasions that it "will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive." *City of Erie*, 529 U.S. at 292; *Renton*, 475 U.S. at 47-48; *N.W. Enters.*, Inc., 352 F.3d at 175.

8 No opinion in *Barnes* commanded majority support. In such circumstances, "the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the

the Court could consider Indiana's position, advanced in its briefing, that the challenged statute is

necessary because nude dancing encourages the secondary effects of prostitution, increased sexual

assaults, and criminal activity.  *Id.* at 582 (Souter, J., concurring).  According to Justice Souter:

> [o]ur appropriate focus is not an empirical enquiry into the actual intent of the enacting
> legislature, but rather the existence or not of a current governmental interest in the service
> of which the challenged application of the statute may be constitutional.  At least as to the
> regulation of expressive conduct, "[w]e decline to void [a statute] essentially on the ground
> that it is unwise legislation which [the legislature] had the undoubted power to enact and
> which could be reenacted in its exact form if the same or another legislator had made a
> 'wiser' speech about it."

*Id.* at 582-83 (quoting *O'Brien*, 391 U.S. at 384).[9]  Justice Souter found that Indiana's asserted

justification of the statute, "although presumably not a justification for all applications of the

statute," was sufficient to permit the state's enforcement of it against entertainment establishments

offering totally nude entertainment.  *Id.* at 583.

---

narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 438 U.S. 153, 169 n. 15 (1976)).  Justice Souter's concurrence is generally regarded as the narrowest opinion and, as such, the Fifth Circuit follows his concurrence as representing the holding of the Court.  *J&B Entm't, Inc.*, 152 F.3d at 37.

[9]  The Court notes that Justice Souter, partially dissenting in *City of Erie*, divorced himself from his concurring opinion in *Barnes*.  *City of Erie*, 529 U.S. at 310-17 (Souter, J., concurring in part and dissenting in part).  There, Justice Souter stated that "intermediate scrutiny requires a regulating government to make some demonstration of an evidentiary basis for the harm it claims to flow from the expressive activity, and for the alleviation expected from the restriction imposed." *Id.* at 313.  This proposition, alone, is not at odds with general First Amendment jurisprudence.  Courts have long required the government to produce some evidence that the government's asserted rationale for regulations of expressive activity must at some point be supported by evidence.  *Alameda Books*, 535 U.S. at 438-39; *Renton*, 475 U.S. at 51-52; *J&B Entm't, Inc.*, 152 F.3d at 371.  But Justice Souter went further, appearing to require, in contrast to the position he had earlier staked in *Barnes*, the government to demonstrate actual reliance on an evidentiary foundation prior to enactment.  *Id.* at 314.  Justice Souter recognized that his *Barnes* concurrence failed to require such an evidentiary basis, having "come to believe that a government must toe the mark more carefully than I first insisted." *Id.* at 317.  Notwithstanding Justice Souter's about face in *City of Erie*, which, in any event, has no precedential force, as discussed in more detail below the Fifth Circuit continues to adhere to Justice Souter's *Barnes* concurrence as articulating the governing law.  *N.W. Enters., Inc.*, 352 F.3d at 175; *J&B Entm't, Inc.*, 152 F.3d at 372.  Until instructed otherwise, this Court will do the same.

11

In *J&B Entertainment, Inc. v. City of Jackson, Mississippi*, 152 F.3d 362 (5th Cir. 1998), the Fifth Circuit endorsed Justice Souter's view in *Barnes* that the government may produce evidence of secondary effects at trial, as opposed to requiring the government to show that it actually relied on evidence of secondary effects prior to enacting that statute at issue. *Id.* at 371-72.  True, the *J&B* Court discussed Justice Souter's statement in *Barnes* in the context of evaluating whether the government had shown, under *O'Brien*'s second factor, that the ordinance at issue furthered an important or substantial governmental interest, rather than in the context of determining the level of scrutiny to apply.  *Id.*  However, the Court had already determined that the ordinance would be reviewed under *O'Brien*'s intermediate scrutiny standard, and its decision to apply that standard did not appear to be predicated on the City's actual intent in passing the ordinance at issue.  *Id.* at 370. Justice Souter's concurrence in *Barnes* makes it (at least implicitly) clear that no evidence of actual legislative intent is needed – there, as here, the legislature failed to indicate its reasons for enacting the statute at issue, yet nevertheless an intermediate level of scrutiny applied.  As stated by the Fifth Circuit in *J&B*: "*Barnes* eschews an examination of the motives of legislators and their knowledge in favor of a determination as to whether the challenged ordinance may be valid in the service of a current governmental interest and some evidence that the challenged enactment may further that interest." *Id.* at 374.

Plaintiffs acknowledge the Fifth Circuit's position in *J&B*, yet, relying on *N.W. Enterprises*, they  nevertheless contend that the State still must prove that the predominate legislative purpose behind the statute was aimed at addressing secondary effects, not expressive content, using evidence of legislative intent at the time the law was enacted.   In *N.W. Enterprises*, the Fifth Circuit extensively discussed, in light of the Supreme Court's decision in *City of Los Angeles v. Alameda*

12

*Books*, 535 U.S. 425 (2002), whether strict or intermediate scrutiny applied to various regulations governing SOBs. The *Alameda Books* majority (including Justice Kennedy's separate concurrence) determined that "intermediate scrutiny applies to SOB regulations whenever the governmental entity was predominantly concerned with regulating secondary effects on adult speech." *N.W. Enters., Inc.*, 352 F.3d at 174 (interpreting *Alameda Books*).

The question here is whether the government's "predominant concern" must be proven as an historical matter – *i.e.* that the enacting legislative body in fact considered evidence of secondary effects in passing the statute -- or whether, as suggested by the State, the government can show that the statute is currently and mainly targeted at addressing content-neutral secondary effects, irrespective of what the enacting legislative body actually intended it to target.

At first blush, some language in *N.W. Enterprises* might seem to suggest that the government must rely on the legislative record to evidence the enacting legislature's predominant legislative concern. For example, the Court stated:

> The standard of constitutional scrutiny, after *Alameda Books*, and taking into account Justice Kennedy's concurrence, is simply whether [the ordinance at issue] addressed secondary effects of adult speech, *as demonstrated by the legislative record submitted by the City.*

*Id.* (emphasis added). The Court also noted that the Fifth Circuit has historically analyzed regulations of SOBs under an intermediate scrutiny level of review, "*where the legislative record demonstrated that the municipality's predominant concern was to regulate secondary effects of SOBs and not to censor the expression itself.*" *Id.* (emphasis added). Plaintiffs suggest that these pronouncements reflect that, before an intermediate level of scrutiny will apply, the Fifth Circuit requires some threshold evidentiary showing that the legislature intended the challenged enactment to target secondary effects, not speech, separate and apart from the evidentiary showing that the

13

government must make to prove a link between the regulation of speech and undesirable secondary effects.

That, to the Court's mind, is a fair reading of *N.W. Enterprises*.  But the better reading is that the *N.W. Enterprises* Court was simply stating that a legislative record predating the passage of an enactment may be sufficient proof of a statute's purpose, but that it is not necessary.  Indeed, relying on its earlier holding in *J&B* and on Justice Souter's concurrence in *Barnes*, the Court seemed to embrace the possibility that purpose may be shown after the fact by reiterating, in its very discussion of the level of constitutional scrutiny to be applied, that "the [government] need not demonstrate that the [enacting body] actually relied upon evidence of negative secondary effects when it enacted [the challenged law]."  *Id.* at 175.  In other words, *N.W. Enterprises* does not foreclose a government from presenting post-enactment evidence demonstrating that a statute's purpose is to reduce unwanted secondary effects.

The Third Circuit reached a similar result in *Phillips v. Borough of Keyport*, 107 F.3d 164 (3rd Cir. 1997).  There the Court was directly presented with the issue of whether the government must produce evidence that it was exposed, pre-enactment, to evidence giving rise to the conclusion that undesirable secondary effects would result if no legislative action were taken.  *Id.* at 178.  As the Court explained:

> There is a significant difference between the requirement that there be a factual basis for a legislative judgment presented in court when that judgment is challenged and a requirement that such a factual basis have been submitted to the legislative body prior to the enactment of the legislative measure.  We have always required the former; we have never required the latter.  Whatever level of scrutiny we have applied in a given case, we have always found it acceptable for individual legislators to base their judgment on their own study of the subject matter of the legislation, their communications with constituents, and their own life experience and common sense so long as they come forward with the required showing in the courtroom once a challenge is raised.

*Id.* at 178.[10]

The *Phillips* Court recognized that a legislative record is probative of legislative intent, but the government is not required to marshal a legislative record "where the court is otherwise satisfied that the legislative measure has a content-neutral target." *Id.* at 178.[11] Significantly, the Court did not tie the existence of a legislative record to the level of scrutiny to be applied: "If we do not insist on a legislative record when we are required to subject a legislative measure to the highest scrutiny, we would be hard-pressed to rationalize insistence on a legislative record when we are, as here, applying a lesser, more deferential standard of constitutionality." *Id.* at 179.[12]

---

[10] In *Giovani Carandola Limited v. Bason*, 303 F.3d 507 (4th Cir. 2002), the Fourth Circuit found that under controlling precedent the challenged restrictions at issue were properly viewed as content-neutral provisions aimed at addressing secondary effects, even though there was no direct evidence of legislative motive presented. *Id.* at 514. The Court noted that the challenged legislation comprised part of North Carolina's alcohol control law which was designed to prevent societal ills such as prostitution, gambling, fights, and nudity. *Id.* at 514-15. The Court reasoned that the challenged provisions "are most naturally viewed as companion provisions, also intended to prevent such societal ills." *Id.* at 515. Therefore, because the Court found that *one* purpose of the challenged legislation was to address secondary effects, and because hostility to protected expression was not the predominant purpose, intermediate scrutiny applied. *Id.*

Here, while § 32.03(k) is codified as part of the Texas Alcoholic Beverage Code, unlike the legislation at issue in *Giovani*, it is not immediately surrounded by other provisions evidencing a general legislative concern regarding the negative secondary effects that can attend the service of alcohol. The Court notes, however, that the Texas legislature announces elsewhere in the Code that the Code's purpose is to protect the "welfare, health, temperance, and safety of the people of the state." TEX. ALCO. BEV. CODE § 1.03. One could reasonably conclude that § 32.03(k), which forms a part of the Code, was enacted to serve these ends.

[11] "If a legislative body can produce in court whatever justification is required of it under the applicable constitutional doctrine, we perceive little to be gained by incurring the expense, effort, and delay involved in requiring it to reenact the legislative measure after parading its evidence though its legislative chamber." *Id.*

[12] The holding of *Phillips* is at odds with the Eleventh Circuit's decision in *Ranch House, Inc. v. Amerson*, 238 F.3d 1273 (11th Cir. 2001). The defendants in *Ranch House* contended that there were not required to make any evidentiary showing as to the purpose behind the Alabama legislature's enactment of statutes regulating the location of SOBs. The Court disagreed, concluding that "state actors in defendants' position must cite to some meaningful indication – in the language of the code or in the record of legislative

Therefore, the Court finds that, for intermediate scrutiny to apply, the State need not produce evidence that the legislature that enacted § 32.03(k) was actually motivated by a desire to curb secondary effects so long as it articulates a current governmental interest that the statute is designed to serve that is unrelated to the suppression of protected expression. The State has satisfied that standard here by asserting that § 32.03(k) furthers the State's interest in reducing the secondary effects that result from the combination of alcohol and erotic dancing, thereby protecting the "welfare, health, temperance, and safety of the people of the State." (Defs.' MSJ Brief at 8, 10).

*(4)*    *Whether the Regulation is Designed to Serve a Substantial Government Interest, Narrowly Tailored, and Reasonable Alternative Avenues of Communication Remain Available*

Having set forth a secondary-effects rationale for § 32.03(k), the State is not relieved of its burden of submitting sufficient evidence justifying the statute. *J&B Entm't, Inc.*, 152 F.3d at 372-73 ("To insist on less is to reduce the First Amendment to a charade.") (quoting *Phillips*, 107 F.3d at 178). At this level of the analysis, the Court looks to "whether the [government] can demonstrate a connection between the speech regulated by the [statute] and the secondary effects that motivated

---

proceedings – that the legislature's purpose in enacting the challenged statute was a concern over secondary effects rather than merely opposition to proscribed expression." *Id.* at 1283. The *Ranch House* Court also noted that "[a]lthough we have indicated that 'there is no constitutional requirement that a city make particularized findings regarding the adverse effects' to be prevented, we have never said that a state actor may prevail under *O'Brien* without pointing to any record evidence suggesting a link between the challenged statute and the advancement of the legislature's alleged content-neutral purpose." *Id.* at 1284 (internal citations omitted).

The Court agrees that the case law makes clear that, to prevail under either *O'Brien* or *Renton*, a state actor must present some record evidence demonstrating a connection between the challenged statute and the advancement of the legislature's alleged content-neutral purpose. This is, after all, the central teaching of *J&B*. However, the Court is aware of no controlling authority suggesting that a state actor must present evidence of the legislative body's actual intent when enacting the legislation at issue. For the reasons stated above, Justice Souter's concurrence in *Barnes*, and the Fifth Circuit's decisions in *J&B* and *N.W. Enterprises* suggest otherwise.

16

the adoption of the [statute]." *Alameda Books*, 535 U.S. at 441. But the State does not need to clear a high evidentiary bar. *Id.* at 438; *id.* at 451 (Kennedy, J., concurring) ("very little evidence is required."). Rather, it "may rely on any evidence 'reasonably believed to be relevant' to demonstrate a connection between speech and a substantial, independent, government interest." *Alameda Books*, 535 U.S. at 438 (quoting *Renton*, 475 U.S. at 51-52).

The State advances the following rationale to justify § 32.03(k): by prohibiting the issuance of private club alcohol permits to SOBs in areas of the state that have, by local-option election designated themselves as dry, the Texas legislature is furthering the substantial government interest of prohibiting alcohol sales in inappropriate locations, and protecting the 'welfare, health, temperance, and safety of the people of the state.'" (Defs.' MSJ Brief at 8) (citing TEX. ALCO. BEV. CODE § 1.03). In support of this rationale the State asserts that it is relying on common sense, case law, and land use studies conducted by various cities on the negative secondary effects caused by SOBs. The Fifth Circuit has explicitly sanctioned the government's reliance on several different types of evidence, including the "experiences of, and studies conducted by, other local governments, as well as opinions of courts from other jurisdictions." *J&B Entm't*, 152 F.3d at 371; *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1274 (5th Cir. 1988) (recognizing that legitimate purpose for a law may be shown from "the experiences of other cities.").

Plaintiffs urge the Court to disregard the studies proffered by the State[13], arguing that they are unauthenticated and constitute hearsay. The Court agrees. The State attempts to authenticate

---

[13]   These studies include an analysis of the effects of SOBs on the surrounding neighborhoods of Dallas, Texas, prepared by the Malin Group, and various summaries of studies addressing various correlations between SOBs and secondary effects in cities around the country. (App. in Supp. Defs.' Mot. Summ. J. ["Defs.' App."] at Tabs A-D).

the studies through an affidavit sworn to by one of its attorneys, Robert F. Johnson, III. Johnson merely states, however, that he obtained the documents from the internet, and he lists the various web addresses at which the studies can purportedly be found. (Defs.' App. at 1-2). While Johnson has surely identified the source from which he obtained the studies, there is no showing of personal knowledge that the studies are what they are claimed to be. *See* FED. R. EVID. 901(a); In re *Homestore.com, Inc. Sec. Litig.*, 347 F.Supp.2d 769, 782-83 (C.D. Cal. 2004). Putting aside the improper authentication issue, the State has wholly failed to even address the studies' plain hearsay problems. The Court will therefore not consider the studies offered by the State for summary judgment purposes.

Nevertheless, simply because the studies are not part of the summary judgment record does not mean that the State is foreclosed from meeting its evidentiary burden. The Supreme Court has recognized that, in attempting to demonstrate that secondary effects pose a threat, the government need not "'conduct new studies or produce independent evidence of that already generated by other cities' to demonstrate the problem of secondary effects, 'so long as whatever evidence [the government] relies upon is reasonably believed to be relevant to the problem that the [government] addresses.'" *City of Erie*, 529 U.S. at 296 (quoting *Renton*, 475 U.S. at 51-52).

Reliance on judicial opinions alone has been held sufficient. In *City of Erie*, for example, the operator of Kandyland, a venue offering erotic dancing, sued the City of Erie challenging the constitutionality of the City's public indecency ordinance prohibiting nudity in public places. 529 U.S. at 282-83. In evaluating whether the city had met its burden to demonstrate that the regulation furthers a substantial governmental interest, the Court held that

> because the nude dancing at Kandyland is of the same character as the adult entertainment

18

at issue in *Renton*, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976), and *California v. LaRue*, 409 U.S. 109 (1972), it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects. And Erie could also reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theatres* to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood.

*City of Erie*, 529 U.S. at 297 (some citations omitted).

Here, the State relies upon the evidentiary foundations laid in a number of cases addressing government regulations affecting adult entertainment enterprises. For example, the State points to the Fifth Circuit's decision in *Baby Dolls Topless Saloons, Inc. v. City of Dallas, Texas*, 295 F.3d 471 (5ᵗʰ Cir. 2002), where the Court found that a 1997 study by the Malin Group supported the City of Dallas's finding that SOBs contribute to increased crime rates. *Id*. at 481. The study relied upon in *Baby Dolls* appears to be the same Malin Study that the State attempts to put into evidence here. (Defs.' App. at Tab A). Thus, while the State may not have succeeded in entering the Malin Study into the summary judgment record, it has demonstrated through the case law that the Fifth Circuit has found that the Malin Study provides a sufficient evidentiary basis to support a correlation between SOBs and higher crime rates. *Baby Dolls*, 295 F.3d at 481. According to the State, the Fifth Circuit's finding in *Baby Dolls* "would certainly support a conclusion by the Texas Legislature that a SOB would be an inappropriate place to allow the sale of alcoholic beverages in an area that voted itself dry by local-option election." (Defs.' MSJ Brief at 11).

The State also cites to a number of other cases that have treated as self-evident the combustible nature of alcohol when mixed with sexually-related entertainment. For example, in *California v. LaRue*, 409 U.S. 109 (1972), the Supreme Court held that a State's determination that "certain sexual performances and the dispensation of liquor by the drink ought not to occur at

premises that have licenses was not an irrational one." *Id.* at 118.  In *New York State Liquor Authority v. Bellanca*, 452 U.S. 714 (1981), the Supreme Court protected from constitutional assault a statute banning nude dancing at places licensed to sell liquor for on-premises consumption, accepting the New York legislature's finding that "[c]ommon sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior."  *Id.* at 718; *see also Blue Canary, Corp. v. City of Milwaukee*, 251 F.3d 1121, 1124 (7th Cir. 2001) (observing that "[e]stablishments that purvey erotica, live or pictorial, tend to be tawdry, to be offensive to many people, and to attract dubious, sometimes disordered, clientele" and commenting that "[l]iquor and sex are an explosive combination").[14]  The Seventh Circuit has also suggested that the government could reasonably conclude based on the case law that nude dancing "was likely to produce adverse secondary effects at the local level, even in the absence of specific studies on the matter."  *Ben's Bar*, 316 F.3d at 726; *Sammy's*, 140 F.3d at 997 (declaring that case law, the experience of other cities, studies performed in other cities and common sense are sufficient).

These cases sufficiently demonstrate that alcohol and SOBs, when combined, have a tendency to foster undesirable, possibly criminal, behavior.  The State may reasonably rely on these cases and its own experience in concluding that alcohol and SOBs simply do not mix and that a law

---

[14] The Eastern District of Texas has also noted the potentially dangerous outcomes that could result when alcohol is served at a SOB:

> One can easily perceive of occasions when, patrons and dancers in an alcohol induced state, are more likely to desire continuation of their erotic experience and, as a result of alcohol, will be less likely to restrain themselves. It follows that [the government] could reasonably conclude that consumption of alcohol under such circumstances might exacerbate violent dancer-patron exchanges and prostitution. Hence, the [government's] ends of protecting its citizenry from these ill-fated secondary effects are rationally related to limiting consumption of alcohol on premises of sexually oriented businesses.

*DFW Vending, Inc. v. Jefferson County*, 991 F.Supp. 578, 599 (E.D. Tex. 1999).

preventing their admixture is reasonably calculated to address negative secondary effects.  It takes no logical leap to infer that if the State is justified in finding that alcohol service may be proscribed at SOBs generally, the same would hold true for SOBs located in dry districts of Texas.  *Alameda Books*, 535 U.S. at 452-53 (Kennedy, J., concurring); *City of Erie*, 529 U.S. at 300-01.

Plaintiffs introduce their own evidence in an attempt to undermine the State's determination that § 32.03(k) is justified in order to combat the deleterious secondary effects wrought when alcohol intersects with sexually explicit entertainment.  According to *Alameda Books*,

> [i]f Plaintiffs fail to cast doubt on [the state's] rationale, either by demonstrating that the [government's] evidence does not support its rationale or by furnishing evidence that disputes the [government's] factual findings, the [government] meets the standard set forth in *Renton*.  If Plaintiffs succeed in casting doubt on a [government's] rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books*, 535 U.S. at 439.

Plaintiffs argue that they have cast sufficient doubt on the State's justification for § 32.03(k) to throw the burden back onto the State to supplement the record with additional evidence.  They have submitted a report from Daniel Linz, a psychology professor from the University of California Santa Barbara, finding that the studies attached to the State's summary judgment materials contain a number of methodological flaws and that there is in fact no causal relation between exotic dance performances that take place at SOBs and adverse secondary effects.  (Pls.' App. in Resp. to Defs.' Mot. Summ. J. at 6-33).  To the contrary, Linz posits that in some cases the presence of SOBs is actually correlated to a reduced number of secondary effects.  (*Id.* at 9); (Pls.' Resp. Brief at 7).

In *G.M. Enterprises Inc. v. Town of St. Joseph, Wisconsin*, 350 F.3d 631 (7th Cir. 2004), the owner of a SOB presented a similar study conducted by Dr. Linz and others, along with an affidavit

21

by Dr. Linz, attacking a Town Board's conclusion that regulation of SOBs would minimize secondary effects. There too, Dr. Linz and other experts challenged the studies relied on by the Town to be "fundamentally unsound" and "methodologically flawed." *Id.* at 635-36. The owner also submitted evidence showing that property values near the club had actually increased over time. *Id.* at 636. The Court concluded that while

> this evidence shows that the Board might have reached a different and equally reasonable conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the Board's legislative process.
>
> *Alameda Books* does not require a court to re-weigh the evidence considered by a legislative body, nor does it empower a court to substitute its judgment in regards to whether a regulation will best serve a community, so long as the regulatory body has satisfied the *Renton* requirement that it consider evidence "reasonably believed to be relevant to the problem" addressed.

*Id.* at 639-40.

Likewise, while a reasonable person, considering the evidence offered by Plaintiffs, could legitimately disagree with the State's conclusions, the Court finds that this is insufficient to invalidate the legislative choice made by the State. The State could reasonably have believed the evidentiary findings in cases such as *LaRue*, *Bellanca*, *Baby Dolls*, *Blue Canary*, and *Ben's Bar* to be relevant to the problems that flow from the service of alcohol at SOBs.

Finally, the Court finds that § 32.03(k) is narrowly tailored to serve the substantial government interest of addressing negative secondary effects. Significantly, as previously stated, the Statute does not limit performers in Plaintiffs' establishments from expressing themselves as they like. It rather simply prohibits SOBs in dry districts from obtaining private club registration permits, which means that they cannot serve alcoholic beverages. *LaRue*, 409 U.S. at 118 ("the critical fact is that California has not forbidden [sexually erotic] performances across the board. It has merely

22

proscribed such performances in establishments that it licenses to sell liquor by the drink."). As recognized by the Seventh Circuit, "[t]his is not a restriction on erotic expression, but a prohibition on nonexpressive conduct (i.e. serving and consuming alcohol) during the presentation of expressive conduct." *Ben's Bar*, 316 F.3d at 726; *see also Sammy's of Mobile*, 140 F.3d at 999 ("we are unaware of any constitutional right to drink while watching nude dancing"); *G&M Enters., Inc.*, 350 F.3d at 638 (quoting *Ben's Bar*, 316 F.3d at 725) ("Alcohol prohibition is, as a practical matter, the least restrictive means of furthering the . . . interest in combating the secondary effects resulting from the combination of adult entertainment and alcohol consumption.").

The First Amendment only forbids the State from denying entities a "reasonable opportunity" to operate their businesses. *Ben's Bar*, 316 F.3d at 726-27. Under the Statute, Plaintiffs remain free to present the same level of erotic performances as before, just not when coupled with alcohol. That Plaintiffs might derive their chief revenue from alcohol service is of no constitutional moment. *Am. Mini Theatres*, 427 U.S. at 78 ("The inquiry for First Amendment purposes is not concerned with economic impact."); *Ben's Bar*, 316 F.3d at 727 ("A 'reasonable opportunity' does not include a concern for economic considerations."). For the reasons stated above, the Court finds that § 32.03(k) does not offend the First Amendment. The State is accordingly entitled to summary judgment on Count One of Plaintiff's Complaint.[15]

## C.    Due Process and Takings

The State asserts that it is entitled to summary judgment on Plaintiffs' due process and

---

[15]   The State has moved for summary judgment on Plaintiffs' claims that § 32.03(k) constitutes a content-based prior restraint on freedom of expression and is unconstitutionally overbroad. As Plaintiffs have failed to respond with argument or evidence showing how the Statute is either a prior restraint or is overbroad, summary judgment is appropriately granted in the State's favor as to those claims.

takings claims because Plaintiffs do not have a property interest of which § 32.03(k) deprived them. Due process claims are subject to a two-part analysis. First, the Court determines whether a property interests exists, and if so, whether the holder of the property interest received due process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001); *Buford v. Holladay*, 791 F.Supp. 635, 643 (S.D. Miss. 1992). The State contends that Texas law forecloses Plaintiffs' claim of entitlement to have their private club registration permits renewed. Indeed, in *Texas Liquor Control Board v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970), the Texas Supreme Court, reviewing a predecessor to Chapter 32 of the Alcoholic Beverage Code, held that "[a] permit to operate as a private club is not a vested property right but is a privilege that is granted and enjoyed subject to regulations prescribed by the Legislature." *Id.* at 895 (citing *State v. Bush*, 253 S.W.2d 269 (Tex. 1952)).

The State also points out that § 11.03 of the Code explicitly states that permits issued under the code are purely personal privileges and do not constitute property. TEX. ALCO. BEV. CODE § 11.03. Relying on this authority, at least one federal court has held that a license to sell alcohol does not confer a property right. *See Glasheen v. City of Austin*, 840 F.Supp. 62, 65 (W.D. Tex. 1993). The district court in *Davidson v. City of Clinton*, 826 F.2d 1430 (5th Cir. 1987) (district court opinion attached as appendix), also held that "one cannot claim a vested property right in a license to sell beer, since a license is but a revocable permit or alienable privilege." *Id.* at 1434. However, while the Fifth Circuit affirmed the analysis of the district court, it expressly declined to adopt the lower court's view that a holder of a liquor license enjoys no protectable property interest. *Id.* at 1431.

Simply because the state of Texas might characterize an interest in a private club registration permit as a "privilege" as opposed to a "right" "is not dispositive of whether that interest is a

protected right under the Fourteenth Amendment, for federal constitutional law determines whether or not an interest is protected by the requirements of procedural due process[.]" *Laudermilk v. Fordice*, 948 F.Supp. 596, 599 (N.D. Miss. 1996).  Even so, the Court need not determine whether federal law would recognize a property right in a private club registration permit because, even if there existed such a right, Plaintiffs here were not denied due process.

"The Supreme Court long ago established that, when a legislature extinguishes a property interest via legislation that affects a general class of people, the legislative process provides all the process that is due." *McMurtray v. Holladay*, 11 F.3d 499, 504 (5th Cir. 1993); *County Line Joint Venture v. City of Grand Prairie, Texas*, 839 F.2d 1142, 1144 (5th Cir. 1988).  It is unquestioned that the Texas legislature enacted § 32.03(k) according to the ordinary legislative process.  And while Plaintiffs might contend that the statute affects only a limited class of people – according to the summary judgment evidence, § 32.03(k) affects at most nine clubs (Pls.' App. at 53) – it applies to SOBs located in dry areas throughout the state of Texas and is not directed at only a few individuals. *See McMurtray*, 11 F.3d at 504 (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 799-801 (1980) (Blackmun, J., concurring)) ("[w]hen governmental action affects more than a few individuals, concerns beyond economy, efficiency and expedition tip the balance against finding that due process attaches"); *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 969 (9th Cir. 2003) (quoting *Halverson v. Skagit County*, 42 F.3d 1257, 1261 (9th Cir. 1994)) ("our cases have determined also that governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individualized notice and hearing; general notice as provided by law is sufficient.").  Therefore, because Plaintiffs have raised no genuine issue of material fact that they were denied legislative due

25

process, the Court grants the State's motion for summary judgment on Plaintiffs' due process claim set forth in Count Three of their complaint.

Plaintiffs also argue that the operation of § 32.03(k) works an unconstitutional taking, without just compensation, of their "property rights" that they have in their private club registration permits. The Fifth Amendment to the United States Constitution guarantees that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. A taking can be either physical or regulatory. *Waste Mgmt., Inc. v. Metro. Gov't of Nashville*, 130 F.3d 731, 737 (6ᵗʰ Cir. 1997). Plaintiffs here can only be alleging a regulatory taking, as the government is not invading their physical property. *Mongrue v. Monsanto Co.*, 1999 WL 219774, at * 2 (E.D. La. April 9, 1999).

A regulatory taking exists when a regulation "denies all economically beneficial or productive use of land[.]" *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). Taking as true Plaintiffs' contention that their revenues are substantially derived from their food and alcoholic beverage service, there is no evidence in the record that § 32.03(k) will deprive Plaintiffs of all reasonable uses of their property from which they can realize value. *H and A Land Corp. v. City of Kennedale, Texas*, 2005 WL 723690, at *12 (N.D. Tex. March 29, 2005) (finding that location restrictions on SOBs did not constitute taking because they did not prevent all reasonable uses of property); *Sammy's of Mobile, Ltd. v. City of Mobile*, 928 F.Supp. 1116, 1123-24 (S.D. Ala. 1996) (even where plaintiffs showed that ordinance banning topless dancing in establishments licensed to sell alcoholic beverages would cause their business to "suffer no small amount of economic harm", no taking was found because plaintiffs failed to demonstrate "that their property will be rendered worthless by the ordinance."). Finding that the enactment and prospective enforcement of § 32.03(k) does not

constitute a taking under the Fifth Amendment, the Court grants the State's motion for summary judgment on Plaintiffs' takings claim stated in Count Four of their complaint.

## D.      Equal Protection

Plaintiffs also complain that § 32.03(k) deprives them of the equal protection of the laws as guaranteed by the Fourteenth Amendment.   Specifically, Plaintiffs contend that the peculiar combination of characteristics targeted by the statute – sexually oriented businesses holding private club registration permits in historically dry districts – constitutes an equal protection violation.

The Equal Protection Clause of the Constitution prevents states from making arbitrary classifications.  U.S. CONST. amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Under the Clause similarly situated persons must be treated in a like manner.  *Id.*  If a challenged state enactment neither violates a fundamental right, nor creates a suspect classification, then the law is subjected to the rational basis test.  *F.C.C. v Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).  That is, the law must only bear a rational relationship to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440.

Sexually oriented businesses, like Plaintiffs, are clearly not a suspect class. *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002).  Plaintiffs argue, however, that § 32.03(k) burdens their fundamental right to free expression and urge the Court to apply strict scrutiny.  As explained above, the State has met its burden to show that the statute targets the secondary effects produced by the combination of alcohol service and sexually-oriented business and does not directly limit protected expression.  The Court therefore finds that the statute does not impair a fundamental right and that it is properly subjected to rational basis review.  *Id.* at 578; *Holmberg v. City of Ramsey*, 12 F.3d 140, 144 (8th Cir. 1993); *DFW Vending, Inc.*, 991 F.Supp. at 597-99.

The Court must therefore uphold the statute "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The State need not produce evidence establishing the rationality of the statute. *Id.* As discussed above in connection with the First Amendment inquiry, the State could reasonably conclude that the consumption of alcohol at places of business where erotic dances are performed could create undesirable secondary effects. *Holmberg*, 12 F.3d at 144; *DFW Vending, Inc.*, 991 F.Supp. at 597-99.

Plaintiffs further argue that the State has failed to explain, if the volatile combination of alcohol and sex were so pernicious, why it has not prohibited alcohol from being served at SOBs in wet districts statewide. Plaintiffs are essentially arguing that the Statute is underinclusive and therefore violative of equal protection. However, the Court finds that the Equal Protection Clause does not compel the State to implement a statewide ban of alcohol at SOBs. The State may tackle perceived evils in incremental fashion, "addressing itself to the phase of the problem which seems most acute to the legislative mind." *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1256 (5th Cir. 1995) (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955)); *Richland Bookmart, Inc.*, 278 F.3d at 572 (finding that a government "may implement its program of reform by gradually adopting regulations that only partially ameliorate a perceived evil."). The Court therefore finds that § 32.03(k) presents no equal protection problems, and summary judgment is accordingly granted in the State's favor on Count Two of Plaintiffs' complaint.

### III.   Conclusion

For the reasons explained in this order, the Court ORDERS that Plaintiff's Motion for Partial Summary Judgment be, and it is hereby, DENIED in its entirety. It is further ORDERED that

28

Defendants' Motion for Summary Judgment be, and it is hereby GRANTED.[16]

      SO ORDERED.

      SIGNED July 13th , 2005

                          JANE J. BOYLE
                          UNITED STATES DISTRICT JUDGE

---

[16] Defendants' argument that Plaintiffs Hotel Development Texas, Ltd. and Green Star, Inc. lack standing is rendered moot in light of the Court's finding that § 32.03(k) is not constitutionally infirm.

29